## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

UNITED STATES OF AMERICA      . CRIMINAL NO. 15-10300-DPW
                              .

             V.                   . BOSTON, MASSACHUSETTS
                              . MARCH 22, 2016

JOHN FIDLER ET AL                 .
     Defendants                 .
. . . . . . . . . . . . . . . . . . .

TRANSCRIPT OF MOTION HEARING
BEFORE THE HONORABLE MARIANNE B. BOWLER
UNITED STATES MAGISTRATE JUDGE

APPEARANCES:

For the Government

U.S. ATTORNEY'S OFFICE
Laura Kaplan, Esq.
Kristina Barclay, Esq.
One Courthouse Way, Suite 9200
Boston, MA  02210
617-748-3371
kristina.barclay@usdoj.gov
laura.kaplan@usdoj.gov
For Defendant Mark Harrington

For Defendant Mark Harrington

Robert Goldstein, Esq.
20 Park Plaza, Suite 1000
Boston, MA 02116
617-742-9015
rmg@goldstein-lawfirm.com

For Defendant John Fidler

Timothy P. O'Connell, Esq.
James Brothers, Esq.
Attorney at Law
C-8 Shipway Place
Charlestown Navy Yard
Charlestown, MA 02129
617-242-4806
TPOCSR@verizon.net

For Defendant Daniel Redmond

FEDERAL PUBLIC DEFENDER OFFICE
Oscar Cruz, Jr., Esq.
District of Massachusetts
51 Sleeper Street, 5th Floor
Boston, MA 02210
617-223-8061
Oscar_Cruz@fd.org

For Defendant Michael Ross

Kevin L. Barron, Esq.
Attorney at Law
5 Lexington St, No. 3
Charlestown, MA 02129-3114
617-407-6837
kevinbarronesq@gmail.com

For Defendant Robert Cafarelli

LEPORE & HOCHMAN, P.A.
Carmine Lepore, Esq.
One Sprague Street
Revere, MA 02151
781-286-8800
CL524@aol.com

For Mass AFL-CIO

SEGAL ROITMAN, LLP
Paul Kelly, Esq.
111 Devonshire Street, 5th Floor
Boston, MA  02109
pkelly@segalroitman.com


Court Reporter:

Proceedings recorded by electronic sound recording, transcript
produced by transcription service.

*MARYANN V. YOUNG*
**Certified Court Transcriber**
**Wrentham, MA  02093**
**(508) 384-2003**

3

1  (Court called into session)

2  (3:34:38 PM)

3            THE CLERK:  --District Court for the District of

4  Massachusetts is now in session.  The Honorable Marianne

5  B. Bowler presiding.  Today is Tuesday, March 22, 2016 in

6  the case of U.S. v. Fidler et al, Criminal Action 15-10300

7  will now be heard.

8            Would counsel please identify themselves for the

9  record?

10            MS. KAPLAN:  Good afternoon, Your Honor, Laura

11  Kaplan on behalf of the United States Government.

12            THE COURT:  Thank you.

13            MS. BARCLAY:  And Christina Barclay on behalf of

14  the United States.

15            THE COURT:  Thank you very much.

16            MR. GOLDSTEIN:  Good afternoon, Your Honor,

17  Robert Goldstein on behalf of Mr. Harrington who is

18  present in the courtroom.

19            THE COURT:  All right.

20            MR. CRUZ:  Good afternoon, Your Honor, Oscar

21  Cruz for Daniel Redmond who is here as well.

22            THE COURT:  Thank you.

23            MR. O'CONNELL:  Tim O'Connell representing John

24  Fidler together with James Brothers representing John

25  Fidler.  Mr. Fidler is present in the courtroom as well.

4

1          THE COURT:  Thank you.

2          MR. BARRON:  Kevin Barron for Michael Ross who's

3   seated here.

4          THE COURT:  Thank you.

5          MR. LEPORE:  Good afternoon, Your Honor, Carmine

6   Lepore for Mr. Cafarelli who's present.

7          THE COURT:  Thank you very much.  Well, we're

8   here for a hearing on Docket Entry No. 60 which is the

9   motion to dismiss the indictment.  Related to that is

10  Docket Entry 81 which is the motion for discovery.  The

11  mot, I'm sorry.

12         MR. KELLY:  Your Honor, I'm, I'm Paul Kelly.  I

13  represent the Mass AFL-CIO.  We're here as amicus.

14         THE COURT:  Did I not deny that motion?

15         MR. KELLY:  I think you allowed that one, Your

16  Honor.

17         THE COURT:  I guess so.  I guess so.

18         UNIDENTIFIED:  You're welcome.

19         THE COURT:  Always nice to see you, Mr. Kelly.

20         MR. KELLY:  Nice to see you too.

21         THE COURT:  Docket Entry 81 motion for discovery

22  is denied.

23         So I'll hear you Mr. Goldstein, are you going to

24  argue on behalf of all defendants?

25         MR. GOLDSTEIN:  I will, Your Honor.  So, there,

5

1   there's been plenty of writing in terms of addressing the

2   issue so I kind of want to boil the issue down to what I

3   think at its most elemental root which is the following,

4   Your Honor.  The, the motion to dismiss should be allowed

5   because the government indicted these defendants with a

6   misunderstanding of what the pertinent legal principles

7   are both under the Hobbs Act and under the National Labor

8   Relations Act or the applicable labor law.  So let me

9   start with the Hobbs Act.

10          The government, the indictment in this case

11   charges that the defendants engaged in wrongful conduct in

12   the form of wages for unnecessary, unneeded, superfluous

13   services and, and the argument back and forth between the

14   defense and the government boils down to what's the proper

15   definition of that language which of course comes from the

16   *Enman's* case and prior to that comes from the *Green*

17   decision.  The government, I contend, Your Honor, indicted

18   this case with the following understanding, and that is

19   that unneeded or unnecessary refers to the worker as

20   opposed to the particular services, meaning the

21   government's construction of the Hobbs Act is that when

22   the union comes to persuade an employer to sign a

23   collective bargaining agreement, if that work, if that

24   company has already hired a particular nonunion worker,

25   then by that fact alone, the union worker becomes

6

1   unneeded, unwanted and superfluous under *Enman's*, and

2   that's a misreading of both *Enman's* and *Green* and all of

3   the law that follows.  What it has to be, Your Honor, is

4   that the services offered is unneeded or unwanted.

5   Meaning from the *Green* case, the Swampers, who the company

6   at issue in *Green* had never used the service of a Swamper

7   and therefore the Court said that those services were

8   unneeded and unwanted, or in the *Robolatto* case, the cover

9   drivers, again, unneeded and unwanted.  Here, Your Honor,

10   the government concedes, and they have to because if you

11   take a look in the indictment drivers were a needed

12   service for the production company identified in the

13   indictment.  If you, if you examine the indictment, Your

14   Honor, it charges in paragraph one, that the International

15   Brotherhood of Teamsters Local 25 was a labor organization

16   representing 11,000 employees and among other things the

17   transportation movie and moving in trade sh, trade shows.

18   Paragraph two, the primary purpose of Local 25 was to

19   negotiate and administer collective bargaining agreements.

20   Paragraph five, Company A was not a signatory to

21   collective bargaining agreement.  They hired its own

22   employees including drivers.  Paragraph six, in the middle

23   of paragraph six the producer explained that all of the

24   drivers had been hired.

25           A union members and union officers don't engage

7

1   in a Hobbs Act extortion when they go to a company to try

2   to persuade that company to replace nonunion worker with a

3   union worker when they are genuine services desired by the

4   company.  Here the genuine service was drivers, and that's

5   what the defendants are charged with trying to push a

6   collective bargaining agreement so that the company would

7   hire drivers.  It can't be that the company, that it's a

8   Hobbs Act extortion, simply because they've already hired

9   drivers.  That's not what *Enman's* or the cases that follow

10  *Enman's* say, and so what we have is, we file our motion to

11  dismiss and the government come back, comes back and says

12  well look, it is unneeded and unwanted because the company

13  had already hired all of its drivers, and so then in our

14  reply pleading we say that's not what *Enman's* says.

15  That's not how you properly read *Enman's* and so the

16  government in its sur-reply then shifts theories, and so

17  before I get to the sur-reply, I want to get back to the

18  government's misunderstanding both of the Hobbs Act and

19  related labor law principles.  In, in reply to our motion

20  to dismiss, the government comes back with two basic

21  principles.  One is the one I just addressed, that the

22  workers were unneeded as opposed to the services, and then

23  two, the government relies on the *A. Terzi* case.  Now

24  Justice Sotomayor's decision where she talks about

25  collective bargaining agreements, and that in that case

8

1 which wasn't a case addressing the language used in this

2 indictment meaning that was not a case of unneeded

3 unwanted workers.  What Justice Sotomayor was addressing

4 in that case was, was labor law, and so what the

5 government says in their opposition to our motion to

6 dismiss is, well in *A. Terzi*, the, the court addressed

7 this labor law issue and in this case, our case, the

8 defendants had no right to engage in a collective

9 bargaining discussion with Company A because they didn't

10 represent a majority of the employees of the production

11 company, and this is the second of the government's

12 profound misunderstanding of relevant law, and we point

13 that out in our, in our, in our reply, Your Honor, is that

14 the way that this industry is set up, Local 25 does not

15 need to secure the, the majority backing of employees of

16 production Company A.  That's not how it works.  How it

17 works is there is there is a, there is a specific

18 collective bargaining agreement applicable to this

19 industry whereby the people who come in, it's an ad hoc

20 basis, companies come in and they become members or

21 signatories to a collective bargaining agreement, and then

22 pursuant to that particular collective bargaining

23 agreement, Local 25 supplies union officials, and so I

24 have for the Court's consideration a copy of the

25 collective bargaining agreement so the Court can see

9

1  exactly what is at issue in this particular case.  And so

2  let me back up because--

3          THE COURT:  And have you provided that to your

4  sister?

5          MR. GOLDSTEIN:  They have a copy of it, Your

6  Honor.  It, it, let me back up so I can get to, the, the

7  facts are important here and the context is important

8  here.  What we have in this case, Your Honor, is the, the

9  classic *Enman's* factual scenario.  We have a union at its

10  highest levels negotiating a collective bargaining

11  agreement with Company A.  That is according to the

12  government itself, on June 9th, the night before the

13  picketing, the president of Local 25, Sean O'Brien and my

14  client, Mr. Harrington, Secretary Treasurer, are on a

15  telephone call with the person responsible for Company A

16  in the state of Massachusetts.  This is in the indictment.

17  It's in the government's pleadings and they're discussing

18  Local 25's desire for Company A to enter into the

19  collective bargaining agreement.  As a result of that

20  conversation, that night, Mr. O'Brien, president of Local

21  25 sends an email to the person heading Company A in

22  Massachusetts and says, as per our conversation see

23  attached, and what's attached and what I have for the

24  Court's consideration is the collective bargaining

25  agreement that Local 25 was hoping that Company A would

10

1   execute and so, Your Honor--

2              THE COURT:  Well if you want me to consider it,

3   I mean, it should be attached and made part of the record.

4              MR. GOLDSTEIN:  And I have a copy for the Court.

5              THE COURT:  All right, and you will do that

6   electronically?

7              MR. GOLDSTEIN:  I will, Your Honor, and so June

8   9th, at 5:16 p.m., Mr. O'Brien sends an email to the head

9   of Company A and attaches the collective bargaining

10  agreement.  So, that's the context on the night before the

11  picketing event, and so you have at the highest levels a,

12  a, a dispute between the labor and the, and the

13  management.  You have Local 25 at its highest level trying

14  to get this company to sign a collective bargaining

15  agreement.  The next morning according to the government

16  both in its indictment and its pleadings, the president of

17  Local 25 either leaves a message or has a conversation.

18  The indictment says leaves a message I think, or it says,

19  had a conversation.  The pleadings say vice versa.  They,

20  they have it both ways.  In any event, the next morning

21  Mr. O'Brien is alleged to have left a message saying we're

22  sending 50 guys to picket.  We know that you're in Milton,

23  and so, that's the factual context for this particular

24  picketing.  That is the classic *Enman's* paradigm.  That is

25  a labor official at its highest levels trying to persuade

11

1   a company to enter into a collective bargaining

2   agreement.  This is not *Green*.  This is not a company

3   trying to force or create a job that didn't exist,

4   Swampers.  This is not *Robolatto* trying to get them to

5   hire cover drivers.  This is not Local 87 with guys

6   standing by the highway stopping trucks on the way into

7   Manhattan and taking money for jobs that aren't performed.

8   This is the classic *Enman's*.  This is the classic pushing

9   for the execution of a collective bargaining agreement and

10  just because Company A doesn't want to use union labor,

11  doesn't convert this into a federal Hobbs Act extortion.

12  This is the exact situation that *Enman's* sort of

13  articulated which is a labor union using means.  Now let

14  me back up in terms of the means used.  There was no

15  violence.  There were no punches thrown.  This is, and

16  *Enman's*, Your Honor, they fired rifles at, at the company

17  property and blew up a substation.  That was the conduct

18  at issue.  Here we have at worst chest bumping, break,

19  cracking knuckles and yelling some ugly language at the,

20  at the members of Company A, but even blowing up a

21  substation's okay as long as it's in the context of

22  legitimate labor objectives, and the government, their

23  argument migrates or evolves from, well okay, maybe the

24  defendants have shown that it was in the context of a

25  collective bargaining situation but they later argue that

12

1    it's not, it wasn't a strike and they try and limit

2    *Enman's* to a, to the situation that involves just a

3    strike.  That's a somewhat littered throughout the

4    government's papers, Your Honor, and *Enman's* isn't so

5    narrow.  Not even close to being as narrow.  What *Enman's*

6    says is that the word wrongful in the Hobbs Act only has

7    meaning if it, if it describes the taking of the property,

8    and what they repeatedly say throughout that decision is

9    conduct aimed towards legitimate labor objectives or

10   legitimate labor ends, and clearly here, Your Honor,

11   trying to get Company A to sign a collective bargaining

12   agreement was a legitimate labor objective and for that

13   reason the facts of this case fall squarely within, within

14   the four corners of *Enman's*.

15          And so, I know, Your Honor, has denied the

16   discovery motion but I, I do want to address, what the

17   government has done, Your Honor, is they've shifted

18   theories.  In their sur-reply they now have a backup.  So

19   in their opposition there's two, there's two basic

20   principles to the governments opposition.  One is the

21   workers were unneeded, okay, and two is that Just, Justice

22   Sotomayor's decision automatically makes the defendants'

23   conduct in this case unlawful, and in our reply we point

24   out, A, it's not that the, that the particular worker is

25   unneeded, it has to be the service is unneeded and two,

13

1   the defendants in this case don't need the majority

2   backing of Company A employees.  They're not interested as

3   Mr. Harrington frankly told the producer they're not

4   interested in Company A.  They're interested in having a

5   couple of teamsters hired to drive the trucks which

6   happens all the time in Massachusetts in this industry.

7   That's how this industry works.  And so what the

8   government does in their sur-reply is they, they migrate

9   to a new theory.  One is they argue for the first time

10  that the defendants always understood no services would be

11  performed.  That is not the theory charged in the

12  indictment.  That doesn't appear anywhere in the

13  indictment.  That doesn't appear anywhere in the

14  government's principal opposition to the motion to

15  dismiss.  And then two, they, they come, and then they

16  start arguing that well okay if it is services as opposed

17  to workers well our, our backup position is that the

18  defendants not only understood that no services would be

19  performed but they, these guys were only drivers and so

20  the company had already hired production assistants, and

21  production assistants do driving and other chores, and so

22  now we've weaved some narrative for the Court to deny the

23  defendants' motions.  And I respectfully submit Your

24  Honor, that the government can't post grand jury, change

25  its factual or legal theories, and that was the basis of

14

1    our discovery motion.  Meaning, if you carefully read

2    their opposition and then carefully read our reply and

3    their sur-reply, they're changing their theory, and so I

4    would respectfully ask the Court to think again about the

5    disc--

6              THE COURT:  No, I reviewed the discovery motion

7    carefully, and I determined that what you are seeking at

8    this time is inappropriate.

9              MR. GOLDSTEIN:  Well, I'm not looking for, I'm

10   not challenging the evidentiary sufficiency before the

11   grand jury, Your Honor.  If not, that's not the reason for

12   the discovery motion.  All I'm saying is if the government

13   wants to rely on these new theories that are articulated

14   in their sur-reply, then they have to have presented

15   evidence before the grand jury about that theory.  I'm not

16   attacking the sufficiency of the evidence.  I'm just--

17             THE COURT:  I understand--

18             MR. GOLDSTEIN:  Okay.

19             THE COURT:  --but my ruling stands.

20             MR. GOLDSTEIN:  All right, so I don't know if

21   the Court has questions for me in terms of the *Enman's*

22   issue but I, I do want to make sure that it, it's--

23             THE COURT:  You've clearly framed it.

24             MR. GOLDSTEIN:  Okay.  Thank you, Your Honor.

25             THE COURT:  Mr. Kelly, do you want to weigh in

15

1    at this time or do you want to hear from the government?

2          MR. KELLY:  I'd be happy to speak now, Your

3    Honor--

4          THE COURT:  All right.

5          MR. KELLY:  --if it please the Court.  I have

6    just three observations to make if I can and the first one

7    is that this indictment is, is actually breathtaking in

8    its scope.  What was going on in this particular day was a

9    protest over substandard wages.  It happens all the time.

10   Anybody, any member of the 700 local unions who are

11   parties, who are affiliates of the AFL-CIO, might have

12   been on that picket line.  Based on the, this indictment,

13   if they were on that picket line, they would be subject to

14   a 20-year felony charge, and, and this is not, this is not

15   extortion like *Robolatto*, $50,000 they got paid for

16   covered drivers.  This isn't that.  This is conspiracy to

17   extort, and the theory, this theory of superfluous

18   services I could be on that picket line.  I could have no

19   idea that somebody said something that the government is

20   now going to, so it, it is really quite draconian, Your

21   Honor, in terms of, in terms of the very limited scope of

22   what has been alleged.

23         Second observation I would like to make is with

24   respect to, with respect to federal preemption.  By, by

25   1959 the labor laws were pretty much in place.  The

16

1  National Labor Relations Act contains, is made up of the

2  Wagner Act.  That's the section seven rights we've

3  protected in our concerted activity and the Taft-Hartley

4  Act 1947 was all these unfair labor practices.  That's

5  pretty much, it was pretty much in place and there was a,

6  a case came before the Supreme Court, *San Diego Building*

7  *Trades v. Garmin* in which certain picketing activity was

8  challenged in the California courts and California

9  determined that the picketing was a tort.  It violated

10 state tort law and awarded damages.  Supreme Court in the

11 United States rev, reviewed that and threw the damage

12 award out and they said this, when, when an activity is

13 arguably subject to section seven, protected activities,

14 or section eight, prohibited activities, the states as

15 well as the federal courts must defer to the exclusive

16 competence of the National Labor Relations Board if the

17 danger of state interference with federal policies be

18 avoided.  So as far as *Garmin* preemption is concerned,

19 both arguably protected conduct and arguably prohibited

20 conduct is preempted.  Now, and there's plenty of *Garmin*

21 case.  We know however, that we're not dealing with state

22 law and federal law here.  We're talking about two federal

23 laws.  So, we go back to then Judge Sotomayor down in,

24 down in New York City someplace, maybe Brooklyn.  I'm not

25 sure.  The question came before her in the civil RICO

17

1  whether *Garmin* preemption applies to this extortionate

2  conduct which was alleged to have been a RICO predicate

3  act.  She said, Second Circuit says no, and she actually

4  admonished the lawyers because they didn't tell her that

5  there was a split in the circuits, and she says, the First

6  Circuit says it does.  That's *Tamborello*, Your Honor.

7         THE COURT:  Oh, I know the case.

8         MR. KELLY:  Yeah, and, and *Tamborello* was a, was

9  a question of deprivation of property by force and so on

10  and so forth and the, and the court said well, if the only

11  illegality here is a labor law illegality, then that's not

12  Hobbs, Hobbs Act material.  And so in my view, and, and I

13  get it, this is not a civil RICO case, it's a federal

14  prosecution, but if the First Circuit wants to change the

15  scope of *Garmin* preemption, they ought to do it.  I think

16  as far as we're concerned, Your Honor, the, this, this is,

17  is a, is preempted by, by the National Labor Relations

18  Act.  The, the, the preemption analysis is both arguably

19  protected and arguably prohibited.  One of the, one of the

20  debates, one of the big debates that Congress had, and

21  there's a Supreme Court case on this one too, is whether

22  what they call top down picketing.  Top down picketing is

23  recognitional picketing.  We're going to put up a picket

24  line against a nonunion employer because we want to force

25  that employer to recognize our union.  There was a debate

18

1   as to whether the National Labor Relations Act

2   prohibited that kind of conduct or not and it was, it was

3   debated in Congress.  It actually was in 1959 that

4   Congress passed 8(b)7 of the Act which says recognitional

5   prohi, picketing is limited to certain circumstances and

6   one of them is no longer than 30 days.  This particular

7   incident which probably falls under recognitional

8   picketing given to what I've, what I've heard of the facts

9   behind it was three hours.  The *Robolatto* case, the

10  *Moulder (ph)* case that these, that the government cites,

11  Your Honor, these were multiyear challenges where, where

12  the, the employers were being coerced to do, to recognize

13  the, the plaintiffs.  This was three hours.  And so, so I

14  guess my point is--

15          THE COURT:  Two minutes, Mr. Kelly.

16          MR. KELLY:  Sorry.  It is arguably protected

17  activity because if you read 8(b)7 for the first 30 days,

18  your, your conduct is protected.  All right, and the last

19  point, Your Honor, the third observation is with respect

20  to the Hobbs Act.  Violence does not make out a Hobbs Act

21  violation.  As my brother said earlier it is, if, if there

22  is violence in connection with legitimate labor

23  objectives, it's not unlawful under the Hobbs Act.  It may

24  be unlawful under state law and on that point, Your Honor,

25  picket lines are always attended or very often attended by

19

1    police details.  They sit there.  They tell them, they

2    tell them if you're getting too close to the, to the

3    people who are trying to get through the line, get out of

4    the way.  They issue citations.  It is the way picket

5    lines have been, have been regulated, Your Honor, is

6    listen to the cops.  Do what they tell you.  You can get

7    pinched if you don't.  So what we have here is we have the

8    federal government second guessing the, who was it the

9    Milton police?  You know, but there was a police detail.

10   They hired them, and nothing, nothing violent happened,

11   Your Honor.  We've covered the--

12            THE COURT:  You've covered your three points.

13            MR. KELLY:  The final, the final point though,

14   Your Honor, even if you don't like, even if you don't like

15   the federal preemption, the Hobbs Act, and this is

16   interesting because, because the government says well the

17   Hobbs Act was after 1946 and that was before the Unfair

18   Labor Practice in 1947.  It's actually not so.  The Hobbs

19   Act when it was originally passed, it contained this

20   extortion definition.  The president wouldn't sign it and

21   then it went back to Congress in 1948--

22            THE COURT:  Okay.

23            MR. KELLY:  --after the Taft-Hartley Act.

24            THE COURT:  We don't need the history.

25            MR. KELLY:  All right.

20

1          THE COURT:  We like it but--

2          MR. KELLY:  All right, but, but--

3          THE COURT:  --at four o'clock we don't need the

4    history.

5          MR. KELLY:  My point is that Section C of 1951

6    says nothing in the Hobbs Act shall modify or effect the

7    labor protective provisions of the Clayton Act, the Norris

8    LaGuardia Act which says that the police are in charge of

9    the picketing and the National Labor Relations Act.  So I

10   say the Hobbs Act itself contains the preemptive effect of

11   Federal Labor law.

12         Thank you, Your Honor.

13         THE COURT:  All right, thank you, Mr. Kelly.

14   Well Ms. Kaplan, are you going to argue?

15         MS. KAPLAN:  I would like to, Your Honor.

16         THE COURT:  All right.  Why shouldn't I allow

17   your brother's motion?

18         MS. KAPLAN:  Okay.  Your Honor, to begin with

19   and just as a general matter, the gra, grand jury

20   proceedings have a presumption of validity and regularity.

21   The defendants have failed to allege that much less show

22   that there's any evidence of any irregularity that

23   occurred and influenced the grand jury's decision to

24   indict.  It's the government's position that this motion

25   is nothing more than the defendant seeking a ruling on

1   sufficiency of the evidence prior to trial and, Your

2   Honor, after spending more weeks than probably--

3          THE COURT:  Well address Mr. Goldstein's points.

4          MS. KAPLAN:  I'm going to Your Honor.  The

5   issues that the defendants raise as I sit here today and

6   in their briefs are questions of fact for a jury to

7   decide.  Whether the work that was demanded by the

8   defendants was for additional labor or whether it was for

9   replacement labor as the defendants now say is a question

10  of fact that a jury should be permitted to decide.  The

11  government is going to argue that the defendants did not

12  seek a contract.  Now Mr. Goldstein submits the collective

13  bargaining agreement to you, Your Honor.  He got it from

14  the government.  That collective bargaining agreement is

15  for the movie industry.  It's not for reality television

16  shows and the witnesses from the production company will

17  testify that they've never signed one of those agreements.

18  They had no intention to sign that agreement.  In

19  addition, Your Honor, there was supposed to be a meeting

20  the following Tuesday to discuss coming to possible terms

21  with the Teamsters.  The defendants cancelled that

22  meeting, Your Honor.  When Mr. Harrington shows up and

23  talks to the production assistants, what he says on the

24  scene is, I'm not as Mr. Goldstein says, I'm not

25  interested in Company A.  I'm not interested in this

22

1    production company.  I want to get a few guys on this

2    job.  So by their own admission, they're not looking for

3    collective bargaining agreement.  They're not looking for

4    a contract.  They're looking to put a few additional

5    laborers to work, and that's when this becomes an

6    illegitimate labor objective.  Whether there was a lawful

7    negotiation or not for work, again, Your Honor, that is a

8    question of fact for a jury.  Whether there was something

9    other than picketing going on such as actual violence and

10   property damage and threats of economic harm as the

11   government alleges is a question of fact for the jury to

12   decide.  They'll be 10 or more witnesses who will come

13   into the courtroom and will testify about violence.  I've

14   heard them.  They've testified in the grand jury.  So to

15   say this case is not about violence is just not, not, not

16   so.  I could go on, Your Honor, but these again are issues

17   that the government is entitled to present to a jury to

18   decide and there's nothing deficient about this

19   indictment.  Now putting, putting that aside and turning

20   to the defendants' legal argument, it too is without

21   merit.  Simply put, the defendants argue that the Supreme

22   Court's decision in *Enman's* applies and exempts the

23   defendants' extortionate behavior and their conduct at

24   Steel and Rye in Milton in June of 2014, the government

25   disagrees.  The clear holding in *Enman's* applies only to a

23

1   legitimate strike situation where the union has a lawful

2   platform on which to seek higher wages.  In the *Enman's*

3   case, there was a collective bargaining agreement.  There

4   was a contract between the union and the employer.  The

5   union had a right then, they had a platform to ask for

6   higher wages.  In this case, Local 25 had no platform on

7   which to seek anything from the production company.  The

8   productions employees had not recognized Local 25 as their

9   bargaining agent.  They hadn't indicated any desire to

10  become members of the union.  There was no collective

11  bargaining agreement.  There was no project labor

12  agreement.  There was no state, federal, city law of any

13  type that required the production company to use union

14  labor.  The victim in this case, the production company

15  was legally entitled to hire whomever it wanted to as

16  production assistants to drive their trucks, and they did

17  that, and they entered into a contract with the production

18  assistants to drive their trucks.  So they had a

19  contractual relationship with their own employees who were

20  nonunion employees when these defendants appeared on this

21  worksite demanding work that others already had, work that

22  was genuine.  There's no question about that that needed

23  to be done but it was unnecessary, unwanted and

24  superfluous because others had already been hired and were

25  in fact contractually obligated to perform that work.

24

1   What *Enman's* held was that if the union pursues

2   agreements with new employers through tactics of violence,

3   threats and intimidation, it does not have a lawful

4   platform on which to claim the property of the employer

5   and the use of such tactics is wrongful under the Hobbs

6   Act.  And that's what happened here, Your Honor.  These

7   defendants even before they got down to Steel and Rye on

8   June 10th, showed up at various locations where the

9   production was shooting or staging and threatened to harm

10  the production.  They used their political connections

11  with the City of Boston so that calls were made by city

12  officials to those employers who had already agreed to

13  permit filming throughout Boston and they did this to

14  ensure that these locations would refuse filming to go

15  forward.  Threats were made by those City Hall officials

16  to withdraw the previously issued permits, and that is the

17  reason that the production company wound up on short

18  notice at a restaurant in Milton.  Their permits had

19  already been issued by the City of Boston.  They had

20  already been approved and the production was ready the

21  next day to film but because of the defendants' actions,

22  those locations where the production was supposed to film,

23  cancelled the filming.  Once in Milton, again contrary to

24  what the defendants say, and again, indicative of the fact

25  that this a question of fact for a jury, the defendants

25

1  used actual force and violence and threats and

2  destruction to property to demand jobs that were already

3  contracted for.  Now there is no question that these

4  defendants could have driven the trucks, but the

5  production assistants that were hired were hired not only

6  to drive the trucks, but they were hired to perform other

7  duties, duties that these defendants could not and would

8  not perform and they weren't, they weren't trained in,

9  they weren't able to--

10         THE COURT:  Such as?

11         MS. KAPLAN:  --such as setting up the stage,

12  moving the equipment.  So this would have, they would have

13  been additional--

14         THE COURT:  Moving the equipment, does that take

15  a lot of training?

16         MS. KAPLAN:  Well the, well probably not, Your

17  Honor, but lighting.  I mean people go to school for this

18  type of thing.  Not, not only that, Your Honor, it's not

19  within their jurisdiction.  They wouldn't do that type of

20  work.  So had they been hired they would have been

21  driving.  They would have been replacing the driver, but

22  they would have also been additional labor because they

23  couldn't perform the work that the drivers, the production

24  assistants were also doing.  So that means that the

25  production would have had to have hired these defendants

26

1    as additional labor, labor that the production company

2    did not need or want just as the government pled in the

3    indictment.  The cases following *Enman* support the

4    argument that without a lawful platform the demands that

5    these defendants made of the production company were in

6    violation of the Hobbs Act, and in *A. Terzi* production

7    then District Court Judge Sotomayor concluded that the

8    *Enman's* claim of rights defense did not apply.  It simply

9    doesn't apply where the union is not authorized to

10   represent any of the employer's employees, and she went on

11   to say that it's a basic tenant of federal labor law that

12   a union has a right to demand that an employer recognize

13   or bargain collectively with the union unless does not

14   have that right, has no right to demand that unless it's

15   first obtained the majority backing of that employer's

16   employees and been certifies, certified as their

17   bargaining representative.  While *Enman's* might apply to

18   violence instead of to the recognition of bargaining

19   demands of a properly authorized union because in that

20   instance the employer has a legal duty to recognize and

21   bargain with the union--

22            THE COURT:  Just one second.  I'm sorry.  I have

23   a little emergency criminal business, but--

24            MS. KAPLAN:  Okay.

25            THE COURT:  Proceed.

27

1       MS. KAPLAN:  So she went on to say that

2   forcing a collective bargaining agreement upon unwilling

3   employees and their employer is wrongful within the Hobbs

4   Acts meaning.  The union is an outside meddler with no

5   lawful claim to the employer's property.  And that's the

6   case that we have here, Your Honor.  The government is

7   going to prove at trial that the defendants had no lawful

8   platform to make their demands and, Your Honor, even if

9   the Court were to find after hearing the evidence at trial

10  that there's some evidence that the defendants had such a

11  lawful platform, the Court can provide adequate jury

12  instructions pursuant to the *Enman's* case and it will be

13  left for a jury to decide whether their conduct falls

14  within or outside the protection of *Enman's*?

15       With respect to the amicus brief, Your Honor, I

16  certainly understand the concerns of the AFL-CIO that

17  somehow this indictment is an attempt by the government to

18  wrongly seek to limit a union's right to picket.  That is

19  not what the government is doing here.  The unions recog,

20  the government recognizes that the unions have a right to

21  picket and the government here has charged that the

22  wrongfulness and the defendants' actions was, was

23  threatening to picket but more than that it was their

24  actual conduct down in Milton.  This is not a case about

25  substandard wages as counsel's, the amicus brief says.

28

1    This is the first time even hearing about that.  These

2    were not defendants who were holding signs, talking to, to

3    inform the public that the production company was paying

4    substandard wages, and again, if that's what it is, if

5    it's a question of fact for the jury to decide, but that's

6    the first that the government's hearing about this.  In

7    fact, the evidence is going to show that this picketing

8    that these activities down in Milton were not authorized

9    by the union itself.  That is what the evidence is going

10   to show.  This case is much more than just about

11   picketing.  It's about the defendant's use of physical

12   harm, property damage and threats of physical and economic

13   harm, to demand wages for work that is unnecessary,

14   unwanted and superfluous and that's why it's a violation

15   of the Hobbs Act.  The issue of preemption as argued in

16   the amicus brief doesn't apply here.  The case law is

17   clear, that there's no preemption until *Garmin* where the

18   court does not have to decide any issues under the NLRA.

19   The NLRA is not a part of this indictment or part of this

20   case, and there'll be no determination necessary for the

21   Court to make under the NLRA.  For these reasons the

22   relief sought by the amicus brief, that the indictment be

23   dismissed as the NLRA preempts the Hobbs Act should be

24   denied.

25            With respect to the defendants other arguments

29

1   as to void for vagueness of the mens rea argument, the

2   government will rest on its brief unless you have--

3          THE COURT:  No, that's all right.

4          MS. KAPLAN:  --any specific questions.

5          THE COURT:  Briefly, I'll give you two minutes,

6   Mr. Goldstein.

7          MR. GOLDSTEIN:  Thank you, Your Honor.  Your

8   Honor, I have to respond to a couple of points.  First,

9   first of all, just because the government has secured an

10  indictment doesn't mean we necessarily push this case to a

11  trial.  *Enman's* itself, Your Honor, was a motion to

12  dismiss that was allowed by the district court, ultimately

13  affirmed by the Supreme Court.  What we just heard is the

14  exact profound misconception of law applicable to this

15  case, misconception with all due respect by the

16  government.  Ms. Kaplan just told you that the, the

17  services were "superfluous" because others had already

18  been hired.  That's the government's articulation of its

19  theory of the Hobbs Act.  That is completely contrary to

20  *Enman's*.  It's not superfluous because others have been

21  hired.  It's supler, superfluous if and only if the work,

22  the services are not needed.  The Swampers in *Green,* cover

23  drivers.  That's not this case.  And so for present

24  purposes, Your Honor, we will concede, although we don't

25  agree, you can conceive for present purposes that there

30

1  were threats and there were violence.  This is the

2  Supreme Court's language fron, from, from *Enman's,* Your

3  Honor, at page 400.  The lit, "The literal language of the

4  statute will not bear the government's semantic argument

5  that the Hobbs Act reaches the use of violence to achieve

6  legitimate union objectives."  *Enman's* is not limited to

7  the strike contacts as Ms. Kaplan just argued to Your

8  Honor.  Littered throughout *Enman's* are references to

9  legitimate union objectives with legitimate union ends,

10  and here, Your Honor, so the government, two, two

11  arguments.  One is superfluous cause people are already

12  hired.  That's not what the law is under *Enman's.*  Two is

13  the defendants didn't have what Ms. Kaplan referred to as

14  a lawful platform to even enter into negotiations.  That

15  too is incorrect, Your Honor.  I'm going to hand up for

16  the Court's consideration, the actual collective

17  bargaining agreement with the email both of which the

18  government has, the email from Mr. O'Brien to Ellie

19  Carbohaul (ph) at 5:16 p.m., and if you look at the actual

20  language of the collective bargaining agreement, Your

21  Honor, first of all, "This collective bargaining agreement

22  is entered into this first day of August, 2013 by and

23  between New England Motion Picture and Television

24  Production Producers Association."  So Ms. Kaplan's

25  argument that this contract doesn't apply to the

31

1    television industry it is contradicted by black letters

2    on white paper.  This is the collective bargaining

3    agreement.  What it says is that "Article 1 recognition,

4    based on a review of recognition cards executed by a

5    majority of drivers traditionally employed in the motion

6    picture and television production industry, theatrical and

7    entertainment industries in the geographical areas covered

8    by this agreement (which is New England) and the

9    association, meaning the Motion Picture Television

10   Production Producers Association, hereby recognizes the

11   union as the exclusive collective bargaining

12   representative of all transportation, coordinators and

13   captains specialized equipment drivers, mechanics,

14   Chauffeur, chauffeurs, helpers, DOT Compliance Officers

15   employed in connection with the production of motion

16   picture and television production industry."  And then

17   when you go to the last page of the collective bargaining

18   agreement, what they ask for is any company that comes

19   into Massachusetts, that they sign this collective

20   bargaining agreement, "By executing the acceptance of this

21   agreement, the below named production company agrees to

22   become part of the New England Motion Picture and

23   Television Production Producers Association and to accept

24   the terms of the agreement."  Meaning this is a

25   specialized area.  Companies come into Massachusetts.

32

1   They shoot film.  They shoot television commercials.

2   It's not some other disparate industry, and so what

3   happens here is they have a unique contract like the

4   construction industry discussed in the *Kirsh* (ph) case,

5   Your Honor, and what happens is when these companies come

6   into Massachusetts, local 25 negotiates with the

7   companies.  They become a member, a party to this

8   collective bargaining agreement.  Yes, the teamsters have

9   no interest in production in Company A.  That's not their

10  interest.  What their interest is Company A becoming a

11  party to this particular collective bargaining agreement

12  signing the acceptance of the terms and then hiring one or

13  two or more union members, and so we just heard it from

14  Ms. Kaplan.  This case was indicted on an improper view of

15  law that superfluous means they have to, that it's, it's,

16  superfluous means the workers not the service and just

17  because they already hired the worker doesn't make the

18  union members unneeded, unwanted, unnecessary ur, or

19  superfluous.  Thank you.

20          THE COURT:  All right, I'll take Docket Entry

21  No. 60 under advisement.

22          MS. KAPLAN:  Your Honor, if I may I just want to

23  point out that this CBA wasn't even a part of, you know,

24  the hundreds of pages of briefs and the government would

25  have liked an opportunity to have responded to that.  The,

33

1  the testimony in this case is going to be that this,

2  that these, this production company was not a member of

3  this association, and now they're going to put the CBA in

4  to say here was this collective bargaining agreement?

5  It's not and it's a question of fact for a jury to decide

6  again.

7         THE COURT:  All right, so noted.  All right,

8  Brendan, where are we in this case on discovery and

9  status?

10        THE CLERK:  (Inaudible - #4:17:07 PM).

11        THE COURT:  Just want to see if we have another

12  status date?

13        MS. KAPLAN:  I think we have another date.

14        THE COURT:  Well I just want to be sure.

15        THE CLERK:  I think at the last status we set it

16  up for the motions.

17        THE COURT:  And the last status was what date?

18        THE CLERK:  On 3/2 instead of for today.

19        THE COURT:  All right, and we excluded the time

20  through today.

21        MR. GOLDSTEIN:  I think I have March 2nd, Your

22  Honor as a--

23        THE COURT:  We, yeah, we have a, there's a court

24  note--

25        MR. GOLDSTEIN:  Okay.  All right.

34

1          THE COURT:  --from March 2nd.

2          MR. GOLDSTEIN:  Yup.

3          THE COURT:  So let's--

4          MR. GOLDSTEIN:  Yes.

5          THE COURT:  Let's talk about discovery at this

6   point.  Where are we?

7          MS. KAPLAN:  The government's completed

8   discovery.

9          THE COURT:  All right.  How much time do

10  defendants need?

11         MR. BARRON:  I, I've written a discovery letter,

12  Your Honor, and the government has responded.  We're not

13  in agreement over release of exculpatory information.  The

14  government has made it's--

15         THE COURT:  Does that surprise me, Mr. Barron?

16         MR. BARRON:  It shouldn't, Your Honor.  That's

17  the way things go I guess.  So I, I think a motion will be

18  necessary.  I, in order to, to keep the filings to a

19  minimum, I'm consulting with my brothers and we're--

20         THE COURT:  All right.

21         MR. BARRON:  --we're going to put together a

22  motion.

23         THE COURT:  So what, another status conference

24  maybe in 30 days?  And you will have your discovery.

25  You'll pretty much know whether or not you're going to

35

1   need further discovery letters the other defendants.

2   All right, can we have a date Brendon?

3          THE CLERK:  How about April 26th at 2:30?

4          MR. BARRON:  26th.

5          MR. GOLDSTEIN:  I'm actually, I'm out of, I'm

6   out of, I'm away on business that particular week, Your

7   Honor.

8          THE CLERK:  Want to do May 3rd at 2:30??

9          MR. BARRON:  That's fine.

10          MR. GOLDSTEIN:  That's fine.

11          THE COURT:  All right, on behalf of all five

12   defendants do you agree, counsel, to exclude the time from

13   today until the third of May for the purposes of speedy

14   trial?

15          COUNSEL:  Yes, Your Honor.

16          THE COURT:  All right, hearing all affirmatives,

17   I will ask the government to file a motion promptly.

18          MS. KAPLAN:  We will, Your Honor.

19          THE COURT:  All right.  Any other matters you

20   with to bring to my attention at this time?

21          MS. KAPLAN:  No, Your Honor.

22          THE COURT:  All right we stand in--

23          MR. BARRON:  Is two o'clock--

24          MR. GOLDSTEIN:  2:30.

25          THE CLERK:  2:30.

36

1        THE COURT:  2:30.  That's Brendan's favorite

2   time.

3        MS. KAPLAN:  Thank you.

4        THE COURT:  All right we stand in recess.

5   (Court adjourned)

6   (4:19:28 PM)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

37

CERTIFICATION

1

2        I, Maryann V. Young, court approved transcriber,

3   certify that the foregoing is a correct transcript from

4   the official digital sound recording of the proceedings in

5   the above-entitled matter.

6

7   /s/ Maryann V. Young                April 1, 2016

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

*MARYANN V. YOUNG*
**Certified Court Transcriber**
**(508) 384-2003**