```
 1                    UNITED STATES DISTRICT COURT
                      DISTRICT OF MASSACHUSETTS
 2

 3

 4    UNITED STATES OF AMERICA         )
                                       )
 5    vs.                              )
                                       )
 6                                     )  No. 1:15-cr-10300-DPW-5
      MARK HARRINGTON,                 )
 7                    Defendant.       )
                                       )
 8                                     )

 9

10    BEFORE:  THE HONORABLE DOUGLAS P. WOODLOCK

11

12                      SENTENCING HEARING

13

14

15         John Joseph Moakley United States Courthouse
                        Courtroom No. 1
16                     One Courthouse Way
                       Boston, MA 02210
17              Thursday, December 15, 2016
                         2:05 p.m.
18

19

20

21              Brenda K. Hancock, RMR, CRR
                    Official Court Reporter
22         John Joseph Moakley United States Courthouse
                       One Courthouse Way
23                     Boston, MA 02210
                        (617)439-3214

24

25
```

1    APPEARANCES:

2

         UNITED STATES ATTORNEY'S OFFICE
3        By: AUSA Lauren Kaplan
             AUSA Kristina E. Barclay
4        John Joseph Moakley Federal Courthouse
         1 Courthouse Way
5        Suite 9200
         Boston, MA 02210
6        On behalf of the Plaintiff.

7

         ROBERT M. GOLDSTEIN, ESQ.
8        20 Park Plaza, Suite 1000
         Boston, MA 02116
9        On behalf of the Defendant.

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          (The following proceedings were held in open court

2    before the Honorable Douglas P. Woodlock, United States

3    District Judge, United States District Court, District of

4    Massachusetts, at the John J. Moakley United States Courthouse,

5    One Courthouse Way, Courtroom 1, Boston, Massachusetts, on

6    Thursday, December 15, 1016):

7          THE CLERK:  All rise.

8      (The Honorable Court entered the courtroom at 2:05 p.m.)

9          THE CLERK:   This Honorable Court is now in session.

10   Please be seated.

11         Criminal Action Number 15-10300, United States v. Mark

12   Harrington.

13         THE COURT:  Well, I think it is important to outline

14   the rules of engagement here.  This is a (C) plea.  What it

15   means is that the Court is not permitted to exercise any

16   discretion in the sentencing; it either accepts it or rejects

17   it.  There are various approaches I think to (C) pleas or

18   various attitudes toward (C) pleas.  There is at least one

19   school of thought that the parties best understand the case and

20   there should be a great degree of deference.  Another school of

21   thought, which is the one that I ascribe to, is that I have a

22   responsibility before my name goes on a judgment to determine

23   whether or not the case is being resolved in a manner that I

24   can find to be truly reasonable.

25         One of the issues that is raised with a (C) plea is

1    that there are some limitations on what the parties can argue.

2    They have made an agreement, and it is an argument that is in

3    the shadow of United States v. Canada in the First Circuit,

4    which places additional restrictions on the United States on

5    what it can argue and how it can respond without running the

6    risk of going beyond its agreement.  So, as a consequence, I am

7    left with a circumstance in which I am not always certain that

8    I have all of the information that I think is necessary.  It

9    may be, it may not be, that the agreement of the parties is an

10   accurate one, one that I am prepared to accept.

11          The second aspect of this is, as we discussed earlier

12   this week, there are some legal issues that surround this case.

13   The legal issues I think are ones that do not proscribe a pure

14   economic-harm extortion, as I indicated.  Nevertheless, there

15   are two tiers.  One would be pure economic harm; the second

16   would be economic harm that is associated in some fashion with

17   threats.

18          Here I am presented with a position that is taken by

19   the Government that this is one case that must be dealt with in

20   terms of the guidelines as economic harm associated with

21   threats.  That is why we are dealing here with a guideline

22   dispute.  The defendant claims, no, this is pure economic harm,

23   and that is part of the dispute that is in the objections to

24   the Presentence Report.

25          I outline all of this to indicate that, merely because

1    there is an agreement between the parties, I am not necessarily

2    bound by it.  My experience has been that in a relatively large

3    number of cases -- I have not tracked it -- but in a relatively

4    large number of cases I reject these pleas, (C) pleas.  And so,

5    I want it to be clear for the parties, as I say, what the terms

6    of the engagement are.  It can mean several things.  It can

7    mean I view the sentence as being unreasonable under any set of

8    circumstances.  I do not think that is the case here.  It can

9    also mean that I am not in a position to say what the

10   circumstances are, and I am not going to apply my signature to

11   the judgment until I have a better degree of certainty

12   regarding that.

13          The whole question of plea agreements is a yeasty one.

14   It is one that in other jurisdictions, in particular, that have

15   more onerous dockets, criminal dockets than this court does,

16   raises questions of whether the role of the Court is to be a

17   processor of agreements between the parties or it has an

18   independent judgment.  They are ready to face that issue

19   because of the nature and size of the docket.  But this is not

20   a processing court.  I am going to exercise independent

21   judgment with respect to that, and that independent judgment

22   may mean that at this point I cannot accept the plea.

23          I outline it so that the parties can speak to me

24   regarding it.  I do not want you to be blind-sided about the

25   way in which I am going to be approaching it, but I think what

1    you have to do is convince me that I am in a position now to

2    know enough about the involvement of this defendant in the

3    relevant conduct here, because I am dealing with relevant

4    conduct, not merely the charging decision that the Government

5    has made.  There has been a charge bargain as well in this,

6    which is legitimate.  It takes the conspiracy charge out, but

7    under the guidelines I have to make a responsible judgment

8    about what I call "vicarious liability," but conspiracy, and it

9    is against a lower standard than would be applied in a criminal

10   case.

11        So, what I propose to do is work my way through the

12   Presentence Report.  I have, of course, the Sentencing

13   Memorandum that was filed on behalf of Mr. Harrington and the

14   attached collection of letters; I have a more recent

15   supplemental letter by Mr. Harrington; and I have the

16   Government's Sentencing Memorandum as well.  I think those are

17   all the written materials, apart from the Presentence Report

18   that I should have.  Is that right?

19        MS. KAPLAN:  I believe so, your Honor.

20        MR. GOLDSTEIN:  That's correct, your Honor.

21        THE COURT:  So, let's turn to the Presentence Report.

22        Two things, I guess, are at issue, that defendant has

23   put at issue.  The first is a question of loss, at least

24   chronologically in the objections, the question of the amount

25   of loss; and the second is which of two potential guidelines

1    could apply in these circumstances.

2          Here is the conundrum for me, and maybe,

3    Mr. Goldstein, you can address it.  One could look at this as a

4    case in which Mr. Harrington simply happened to be present when

5    others were making threatening remarks, but he is also a union

6    official, and he has some responsibility at a site for the

7    conduct of union members in pursuing their goals.

8          Viewing it from a prospect or perspective of the kinds

9    of considerations for guidelines that I must have in mind for

10   Section 1B1.3, how can I not say that at least it is an open

11   question about whether or not he was part of jointly

12   undertaking criminal activity that was within the scope of a

13   jointly undertaken choice that was in furtherance of that

14   criminal activity, and that the threats, which at least on what

15   I now know not made by him but made by others, were reasonably

16   foreseeable in connection with that criminal activity?  Putting

17   to one side whether I can say that now one way or the other, I

18   am left, I think, with this view that I need to know more.  How

19   do you ordinarily know more?  Well, we have a trial.  Mr.

20   Harrington could choose to participate in the trial or not

21   choose to participate in the trial, but getting a (C) plea

22   resolution of it is something that puts me in the posture of

23   not being able to make that kind of determination.

24          So, having said that, it is teed up by which of the

25   guidelines is involved and how much loss is involved, less for

1    loss depending on the guidelines.  So, perhaps, Mr. Goldstein,

2    you want to speak to that.

3           I note that the Government in its position reflected

4    in the Plea Agreement has taken a position that this is a

5    guideline of 2B3.2, which is the associated with threats.  So,

6    the Government has a different view, and certainly Probation

7    has a different view.

8           MR. GOLDSTEIN:  They do, your Honor.  So, let me --

9    can I back up?  I will answer your question.

10          THE COURT:  Sure, absolutely.

11          MR. GOLDSTEIN:  To back up just a second, your Honor

12   had made an observation at the hearing earlier this week in

13   terms of a (C) plea and the parties, I'm paraphrasing, not

14   really wanting the Court's judgment in terms of making a (C)

15   plea.  That may be a --

16          THE COURT:  Well, they are foreclosing it.  Whether

17   they want it or not, although I suspect that they do not, that

18   is why they enter into a (C) plea; that they are not going to

19   leave it to the independent judgment of the judge; they are

20   going to say to the judge, "Here, take it or leave it."  That

21   is what a (C) plea is.

22          Now, the way I analyze that, customarily analyze it

23   is, is this in the realm of reasonableness to me?  And I have,

24   I think, greater leeway than I might otherwise in my own mind

25   of deferring to the parties.  But it is not total or even

1   substantial deference.  It is a recognition the parties know

2   their case.  They also have various strategic, tactical,

3   resource-related choices that they make, but those are not my

4   choices.  My responsibility is to impose a sentence that fairly

5   reflects the culpability of the defendant, and if I do not know

6   enough to be able to make that choice, even if the parties have

7   already made that choice, then I simply reject the (C) plea.

8   That does not mean that I do not at the end of the day end up

9   where the (C) plea is, but it does mean that, at least in that

10  sense, I need more.

11          Now, sometimes a (C) plea is presented to me that

12  there is no way in God's green Earth that I am going to do

13  that.  This one does not quite follow that category.  I can

14  perceive circumstances developing that I would adopt and

15  embrace that would make this not unreasonable, I will put it

16  that way, to illustrate that it is not my ultimate choice here.

17  I can say in candor, because I want a candid discussion, I view

18  it as a very humane recommendation on the part of the

19  Government here, but I cannot adopt it, I think, properly, or,

20  in any event, I am not going to adopt it until I am satisfied

21  that I know enough about the circumstances to be able to say

22  that here are the facts that constitute relevant conduct by

23  this defendant, and, consequently, this is where I would come

24  to rest on it.

25          MR. GOLDSTEIN:  My only point in going backwards to

1    that point, your Honor, was just to make the observation that

2    it's not my intention, certainly, as the advocate, to deprive

3    the Court of its judgment.  The purpose, from my perspective,

4    in terms of trying to reach a (C) agreement with the Government

5    is so that my client, in the context of waiving important trial

6    rights, understands what the potential result will be.  But

7    it's only -- I'm only seeking the Court's considered judgment

8    as to whether or not our recommendation to the Court fits your

9    Honor's ultimate view of the case.

10         THE COURT:  And I credit that, and I do not disagree

11   with it.  As I said, this is in a range that there are

12   conceivable circumstances in which I would embrace it or adopt

13   it or use it.  There are some (C) pleas, this is not that one,

14   in which I think the parties just would prefer not to have the

15   judge make the determination for reasons of avoiding

16   confronting the circumstances of the case for whatever reason.

17         In any event, we all have our different

18   responsibilities.  My responsibility is to ultimately sign the

19   judgment, and I do not sign judgments until I am ready to say I

20   endorse this view of the calibration of culpability.

21         MR. GOLDSTEIN:  And in that light, your Honor, there

22   are no facts that I want the Court to not have in this case.

23   I'm not going to raise any objections to the Government

24   answering whatever questions your Honor has in terms of the

25   facts.  There will be no Canada challenge.  And so, there are

1    no facts, from my perspective, that the Court can't have in

2    this case to consider and evaluate both Mr. Harrington's plea

3    and the ultimate sentence issued in this case.

4         From our perspective, the facts are fairly

5    straightforward in terms of Mr. Harrington's role in this

6    event, and I don't need to rehash what's in my objections and

7    in the Sentencing Memorandum.  I know your Honor has carefully

8    read those materials.

9         But Mr. Harrington was recovering from heart surgery

10   that occurred on April 4th of 2014.  He was working a limited

11   schedule during the relevant events of this case, which are, in

12   my understanding, early June of 2014.  He had a series of

13   telephone calls with the producer of *Top Chef*.  My

14   understanding is that during every one of those phone calls he

15   comported himself in a professional manner.

16        Carrying forward to June 9th and June 10th, there was

17   a series of phone calls between Sean O'Brien, the President of

18   the Teamsters, or at least one call, and the producer.  After

19   that telephone conversation, during which they were talking

20   about negotiating a Collective Bargaining Agreement,

21   Mr. O'Brien forwarded a copy of the Teamsters' template

22   Collective Bargaining Agreement via email to the producer that

23   evening.  She responded with a "Thank you" email.

24        The next morning, June 10th, Mr. Harrington got up

25   very early that morning to head in to work.  Candidly, part of

1    the object of that day was whether or not *Top Chef* would be

2    filming at the Omni Parker House that morning.  They weren't.

3            When he was driving home that day from work he

4    received a phone call at approximately 9:42 a.m. that *Top Chef*

5    had relocated to the Milton restaurant.  He went over to the

6    Milton restaurant.  He did not arrive there at the same time as

7    the other individuals who have been charged in this case, your

8    Honor, and it's my understanding that during that 90-or-so

9    minutes Mr. Harrington was present at the Steel & Rye

10   restaurant he was -- first thing he did was speak to the

11   producer, in my understanding in a professional manner, to ask

12   whether or not *Top Chef* would be signing the Collective

13   Bargaining Agreement.  He found out they weren't.  He told them

14   that in that case they would, then, be picketing.

15           The picketing activity, as far as Mr. Harrington was

16   concerned, was not entering the property of Steel & Rye, but

17   staying on the sidewalk, which was consistent with

18   conversations he had with the two Milton Police Officers who

19   were present during the entire time that Mr. Harrington was

20   there, which was that the Teamsters had to stay off of the

21   property of Steel & Rye, they had to stay on the sidewalk, that

22   they could lawfully -- or not lawfully -- but the Police

23   Officers told them that they could walk in a circle in front of

24   cars entering or exiting for a period of time; then they had to

25   move so the cars would enter.

1          It's my understanding that Mr. Harrington had

2     instructed the other defendants they were not permitted to go

3     into the property of Steel & Rye, that when the so-called

4     lockstep incident supposedly happened, Mr. Harrington did not

5     see it.  There's a big area, your Honor, in terms of the Steel

6     & Rye, and my understanding is that when they arrived at a

7     different time they may have gone into the parking lot.

8     Mr. Harrington wasn't a participant to that, didn't observe it.

9          And so his role, what the Government calls to be

10    "lesser conduct" I view as limited conduct, is he arrives and

11    he in my estimation or my understanding, your Honor, he is the

12    gentleman who is trying to pacify the event, meaning, he is

13    trying to make sure that the others comport with what their

14    directions are of the two Milton Police Officers who were

15    present during that day.

16          THE COURT:  Is there any question that on the state of

17    this record, however, using your characterization, that the

18    other defendants engaged in activity that could be viewed as

19    threatening in the presence of Mr. Harrington?

20          MR. GOLDSTEIN:  I'd like to speak to my client.

21          THE COURT:  Sure.

22          MR. GOLDSTEIN:  May I have a moment, your Honor?

23          THE COURT:  Yes.

24     (Atty. Goldstein conferred with the defendant off the record)

25          MR. GOLDSTEIN:  So, in terms of the conduct that's

1    involved in this case, I think it would be consistent with the

2    Court's characterization.  There is what I would call the

3    "security guard incident," where one, two or three of the

4    charged defendants walked up to what's described to be an

5    elderly security guard.  Mr. Harrington didn't witness any of

6    that, wasn't a participant of that.  The chest-bumping and

7    things of that nature, my understanding is that he did observe

8    different participants, meaning -- it wasn't such a one-sided

9    event, your Honor.  There were members of the *Top Chef*

10   employment who were engaging the Teamsters at an equal -- at

11   least at an equal level of agitation.  And so, Mr. Harrington

12   did observe some chest-bumping or things of that nature between

13   the two sides.  So, there is that component to it.

14            THE COURT:  And as to Mr. Fidler's comments?

15            MR. GOLDSTEIN:  He did not witness any of that or hear

16   it or understand that it --

17            THE COURT:  So, let me understand from the Government,

18   is there any dispute about that characterization of

19   Mr. Harrington's presence when these events took place?  Of

20   course, the next question I am going to ask, and I will ask it

21   of Mr. Goldstein first, but what is his responsibility here?

22   Not to turn part of Mr. Goldstein's argument on Mr. Goldstein,

23   but the earlier development of the argument was he was

24   exercising the authority of an adult dealing with childish

25   activity.  "Childish" understates it.  That suggests that he

1    gets the benefit of exercising responsibility, but also he gets

2    charged with failure to exercise the responsibility, charged in

3    the sense of, reading this, say he did not take any steps or

4    sufficient steps to stop them from engaging in this.

5           But, Ms. Kaplan, just on the factual circumstances of

6    Mr. Harrington's presence during the course of these kinds of

7    activities.

8           MS. KAPLAN:  I think, your Honor, that this is a

9    little bit different than that he was the responsible grownup

10   there and he should have done something else.

11          THE COURT:  I will get to that in a moment, but I just

12   want to understand the factual circumstances of what happened

13   in his presence that could be considered to be threatening.

14   And part of this is also the Government has taken a position

15   with respect to what the guideline is, which is that there was

16   threats of violence involved.

17          MS. KAPLAN:  Right.  So, there are things that

18   happened before he even gets there, but we can talk about that

19   afterwards.  But what happens while he's there -- there's a

20   video, and your Honor --

21          THE COURT:  I'm sorry?

22          MS. KAPLAN:  There's a videotape, and your Honor can

23   watch it, and you see Mr. Harrington circling around with his

24   co-defendants as one of them is looking directly at the

25   production assistant and cracking his one fist into his other

1   (indicating), calling them names.

2          Now, Mr. Goldstein and I have talked about this.

3   Mr. Goldstein contends that the defendant came upon that

4   afterwards, but you do clearly see Mr. Harrington in that

5   videotape in the circle along with these other defendants who

6   were making their disparaging remarks, calling the production

7   assistant a "towel head" and other such names.

8          It is a big place.  I don't think that the Government

9   does have a witness who is going to say that Mr. Harrington

10  saw, for instance, the chest-bumping incident, but the

11  Government's position is that it was reasonably foreseeable

12  that things like this would happen.  There were conversations

13  prior to Mr. Harrington arriving there between himself and the

14  co-defendants.  There were conversations he had the day before

15  with the production assistant, and I would not --

16         THE COURT:  With respect to the confrontations between

17  Mr. Harrington and the co-defendants, apart from having

18  conversations at that time that presumably deal with what the

19  activity is going to be, is there anything that is inculpating

20  in those conversations that you are aware of?

21         MS. KAPLAN:  No, and we don't know what took place.

22  We just have toll records that show that Mr. Harrington did

23  speak to several of the different defendants.  I would not

24  characterize the exchange that Mr. Harrington had with the

25  production assistants as necessarily polite, and they were also

1    interspersed the day before with his co-defendant Redmond

2    threatening that he was going to shut the event down.  So,

3    there's Redmond talking to the production assistant.  They put

4    Harrington on the line.  Maybe he's not raising his voice,

5    maybe he's not saying, "We're going to shut you down," but I

6    think, given the fact that this is going on simultaneously, it

7    was reasonable to expect that the production assistant would

8    have an understanding that there was going to be some sort of

9    trouble.  And, in fact, the night before there was a Teamster

10   who showed up in Woburn who said, "You know, we know where

11   you're filming tomorrow, and there is going to be trouble

12   tomorrow."  So, I can't tell your Honor that --

13          THE COURT:  I want to hold off on the Woburn, because

14   that goes to question of loss that has been raised here.

15          MS. KAPLAN:  Yes.

16          THE COURT:  But, apart from the association evidenced

17   by telephone calls and so on between Mr. Harrington and the

18   co-defendants and his presence during the activities on

19   June 10th, is there any other, I will call it "direct evidence"

20   -- that is not meant to be a loaded term but simply to suggest

21   something other than circumstantial evidence -- of

22   Mr. Harrington's either willful blindness to what is going on

23   or participation in it?

24          MS. KAPLAN:  Well, I think the other thing is, when he

25   is walking around in this circle he is videotaping.  He's

1    taking out his cellphone and he's videotaping the production

2    crew also, which I think was his own way of intimidating the

3    crew as well.

4         And my understanding from my conversations with

5    Mr. Goldstein was that Mr. Harrington did have some knowledge

6    that some food-delivery trucks were being stopped and prevented

7    from entering, as well as some guests and some of the

8    celebrities were being prevented from entering.

9         THE COURT:  But not the circumstances under which they

10   were being confronted?

11        MS. KAPLAN:  I'm sorry?

12        THE COURT:  The circumstances in which they were being

13   confronted.  I have in mind Mr. Fidler's alleged comments here.

14        MS. KAPLAN:  Yes, yes.

15        THE COURT:  All right.  So, I guess where I am on this

16   is context is everything.  Trying to understand exactly what

17   the role was is everything.  I was, of course, aware of the

18   video.  You offered to provide it to me.  I chose not to look

19   at it until we had this conversation.  It is part of the

20   evidence in the case, but it has to be put in some sort of

21   context, I think, for me to meaningfully say alternatively what

22   was going on here.  There is no suggestion, I do not think, the

23   Government is not taking the position, that there is direct

24   threat of violence by Mr. Harrington, but there are facts and

25   circumstances which I guess led them to where they are on the

1    guideline, the choice of the guideline, to suggest that he was

2    involved here and aware of it.

3         Now, does that take him to 1B1.3?  Not quite, because

4    he has got to embrace the agreement there, but I am not sure I

5    can decide that.  The best thing I can say is I am not sure I

6    can decide that at this point, the facts and circumstances, if

7    I were required to make a judgment.  And the reason I am saying

8    that in a tentative sort of way is, if I do not accept the plea

9    I do not want to be understood to have taken a position on any

10   of these things.  What I am saying is I do not know.  But if I

11   were required to take a position, I would say there is reason

12   to believe that Mr. Harrington, while not having direct

13   responsibility for the threats themselves, had involved himself

14   and hierarchically a responsibility in this area for those who

15   engaged in such threats himself.

16        In short, it seems to me that the choice here to apply

17   2B3.2 is a fair one on the part of the Probation Office, and so

18   I am going to reject that objection to it in calculating the

19   guideline before I get to the larger question of whether I can

20   accept the proposed plea.

21        Then we go to the question -- I think the next

22   question is the question of loss.  It is perhaps more

23   meaningful if a different guideline, basic guideline, had been

24   chosen, but it is still meaningful here, and I want to be sure

25   I understand what is going on here.  There is in the objection

1    reference to other services that seem to be parallel, like the

2    provision of government services in Cambridge and Rockport not

3    included in the loss, and similarly Groton as well, I guess.  I

4    am not sure I understand it all.  I know that the Government is

5    looking for Woburn, and that is challenged, and also for RSIG,

6    and that is challenged.

7            So, first, what is the Cambridge/Rockport/Groton

8    stuff, and why isn't it being pursued?

9            MS. KAPLAN:  Nothing.  I think that that was just

10   included in the paperwork that we received from the victim

11   company.  That had nothing to do with added security in

12   connection with these events.

13           THE COURT:  So, as I understand the Government's

14   position on this, it is that, faced with the prospect of

15   attention by the Teamsters on various sites going forward, that

16   they took reasonable steps to protect themselves --

17           MS. KAPLAN:  Yes.

18           THE COURT:  -- and those steps ought to be reimbursed.

19           Now, there is also a suggestion that I think

20   Mr. Goldstein made that some of this is pre-June 9.  I am not

21   sure if that is your contention entirely here, and I am not

22   sure I want to get into accounting yet, unless I have to.

23           MR. GOLDSTEIN:  There are a couple of entries, I

24   think, in the records that predated June --

25           THE COURT:  Would they take it under $20,000?

1          MR. GOLDSTEIN:  The point is, your Honor, you have

2     already embraced a more global view of Mr. Harrington's

3     relevant conduct, and I think in that context --

4          THE COURT:  Potentially.

5          MR. GOLDSTEIN:  Potentially.  I think in that context

6     that the objection to loss is not one well made to the Court,

7     given its tentative view in terms of --

8          THE COURT:  Well, it will make a difference of one

9     point on this guideline.  Looking at it, it seems to me that

10    this was consequential and, consequently, appropriately to be

11    included in loss.  It may be, if it became material, something

12    to which a scalpel should be applied, and that scalpel might

13    cut off enough to take it one point down here.  But I am

14    generally of the view that this has been consequential loss.

15         Now, if somebody comes in from *Top Chef* and says, "We

16    just thought we would have this included here, it did not make

17    any difference what the Teamsters were doing one way or the

18    other," that would be different, but I do not think that is the

19    case in this.

20         So, I think I have dealt with all of the potential

21    objections to the guidelines, unless there is something else

22    that you wanted to raise here.  Of course, I have read the

23    alternative reading of the circumstances, but are there any

24    other guideline questions that you want me to deal with?

25         MR. GOLDSTEIN:  I think inclusive in the 2B3.2 is the

1    plus two points for the express or implied threat of bodily

2    injury.  I take it the Court has included that within its prior

3    resolution of which guidelines apply.

4            THE COURT:  It seems to me that there is sufficient

5    evidence in here, and that is why I am saying I cannot decide.

6    But there is sufficient evidence in here for one to conclude

7    reasonably that Mr. Harrington could be charged vicariously

8    under 1B1.3 with involvement in this, whether he, himself,

9    engaged in the threats themselves.  There were threats, at

10   least on the record here, although, as I understand it from the

11   Government, it is not taking the position that he was the

12   voice, the specific voice of that threat, of any of those

13   threats.

14           So, having gone through that, I think we have then

15   come to a total Offense Level of 18, a Criminal History

16   Category of I, the guideline range under these circumstances is

17   27 to 33 months in prison, supervised release of 1 to 3 years,

18   a fine range of $6,000 to $60,000, restitution of $24,023.95,

19   and a Special Assessment of $100.

20           Are we dealing with the same set of numbers based on

21   that set of calculations?

22           MR. GOLDSTEIN:  Yes, your Honor.

23           THE COURT:  So, I guess, then, Ms. Kaplan, I want to

24   hear whatever additionally you would like to say about the

25   recommendation that you make here.

1          MS. KAPLAN:  Thank you, your Honor.  The Government

2     understands, your Honor, that the Court must look at the

3     sentencing factors under 3553(a) in fashioning a sentence which

4     is sufficient but not greater than necessary to comply with the

5     purposes of the *Sentencing Guidelines*.  And although your Honor

6     has calculated we think appropriately the *Sentencing Guidelines*

7     of 27 to 33 months' incarceration, the Government and the

8     defendant have agreed to a sentence of 2 years' probation with

9     6 months of home confinement, and we believe that this is

10     sufficient but not greater than necessary to comply with the

11     purpose of the *Sentencing Guidelines*.

12          We recognize that this is a departure from the

13     guidelines, and I am prepared to explain our reasoning, some of

14     which I think that you have heard already.

15          Looking at the nature and the circumstances of the

16     particular offense here, there's no question that the crime of

17     extortion is a serious one, and there's no question that the

18     defendant participated in the conduct that was intended to

19     cause harm, as he has admitted, to the crew of *Top Chef* filming

20     in Boston and elsewhere in June of 2014.

21          What makes the conduct in this particular case

22     criminal is not the defendant's claim that they were picketing,

23     which the Government does not even believe that they were

24     doing; but, rather, the crime here was the threats, whether

25     they were economic, of an economic nature or of a physical

1    nature, and the activity which was specifically designed to

2    disrupt the business of *Top Chef* on the day of the shooting,

3    just as the celebrity hosts and the guests were arriving and

4    just as the work was already in the process of being done, and

5    they were doing this to obtain an illegitimate labor objective,

6    which was union scale wages and benefits for jobs that were

7    unwanted, unnecessary and superfluous.

8         So, the crime was not the gathering by Mr. Harrington

9    and the defendants to protest *Top Chef* having hired a nonunion

10   crew, but it was, rather, as your Honor alluded to the other

11   day, threats to shut down the event by blocking the deliveries

12   of food and the cars and the guests to the show and the

13   celebrities by the name-calling of racist and homophobic slurs,

14   the threats of physical harm to the crew and the celebrity

15   guests.  There was chest-bumping, there was pushing, there was

16   shoving to the extent of one crew member was pushed to the

17   floor, and there was other physical harm.

18        If this were really just picketing or organizing, your

19   Honor, we would not be here, the Government would not have

20   involved itself in this case.  There was no leafletting, there

21   was no effort to organize the crew, and there was no approval

22   by the union for even a picket on that day.

23        However, when we looked at this particular

24   defendant --

25             THE COURT:  Can I just pause for a moment, just so I

1  understand that?  As to the collective-bargaining-based

2  information, as I understand it and Mr. Goldstein characterized

3  it, the initial encounter with the producer resulted in

4  Mr. Harrington sending a copy of the CBA to the producer, and

5  Mr. Goldstein, if I heard it correctly, said that was

6  undertaken as an effort to see if they will sign onto it.

7      The second part of it, I guess, is that you said it

8  was not authorized by the union, and I do not know what

9  "authorization" means.  Does Mr. O'Brien have to sign off on

10  it?  Does somebody else have to sign off on it?  Can

11  Mr. Harrington in his position sign off on it?  What does it

12  mean to say a picket is not authorized?  What formalities are

13  necessary, if any?

14      MS. KAPLAN:  So, with respect to your first question,

15  the evidence will be that at no time was this company going to

16  sign a Collective Bargaining Agreement with the Teamsters.

17  That was never going to happen.

18      THE COURT:  And just to get to the point that I want

19  to get to, and I will hear anything else you want to say, but

20  were they solicited to sign off on the CBA by Mr. Harrington or

21  someone acting in concert with him?

22      MS. KAPLAN:  So, what had happened was the person, the

23  individual that Mr. Harrington was talking to was a

24  production -- she was a production assistant -- a line

25  producer.  She was not authorized to enter into an agreement

1    with the Teamsters.  She was reporting to other people.  And

2    the extent of her authorization was that she was permitted to

3    set up a meeting with Mr. Harrington and Mr. O'Brien, a meeting

4    that she did schedule.  I believe it was supposed to be a

5    telephone, conference call.  After that meeting was scheduled,

6    it was either Mr. Harrington or Mr. O'Brien who emailed a

7    Collective Bargaining Agreement.  Now, this was a Collective

8    Bargaining Agreement for the motion-picture industry.  It's a

9    Collective Bargaining Agreement that this company has never

10   been a party to.  So, it's just a Collective Bargaining

11   Agreement that you can sign onto if you wish, but *Top Chef*, NBC

12   have never been a party to that agreement.

13           THE COURT:  I just want to understand it a bit more.

14   The line producer, if that is the proper term, but a

15   sub-numerary, I guess I would say there, becomes the contact.

16           MS. KAPLAN:  Yes.

17           THE COURT:  But can it fairly be said that, while the

18   prospects of them signing onto the CBA are very low, at least

19   there was an effort to provide or solicit their signature on

20   the CBA, and is there anything wrong with the formalities of

21   that?  Is Mr. Harrington in a position to say, "We would like

22   you to join"?  Does he need somebody else's approval to do

23   that?  Does Mr. O'Brien need that?

24           And I would add, to provide some context, Mr. O'Brien

25   is not a defendant in the case.  I assume that that is because

1     he was not present on June 10th.  Is that a defining feature,

2     distinguishing feature for him?

3              MS. KAPLAN:  That is one of the reasons, and the other

4     reason will be my answer to your second question.

5              THE COURT:  Okay.

6              MS. KAPLAN:  There's no question that they sent a

7     Collective Bargaining Agreement, but they also then canceled

8     the meeting.  So, it's the Government's view that they -- you

9     know, they canceled the meeting, and when asked why, they said,

10    "Because we don't think you're taking this seriously."

11             In addition, Mr. Harrington told the same line

12    producer, "Look, we have no interest in *Top Chef*.  All we want

13    is for you to hire a few people."  So, it was made clear to

14    them that they didn't want to organize, they didn't want a

15    Collective Bargaining Agreement, they just wanted a few people

16    hired for the job.  So, that's why I say this wasn't -- you

17    know, they emailed the Collective Bargaining Agreement, but on

18    neither side was there an intention to sign a Collective

19    Bargaining Agreement.

20             With respect to your second question about the

21    picketing, Mr. O'Brien after the incident in Milton went into

22    the Milton Police Department with his attorney and disavowed

23    any -- he said that this union -- these people were rogue

24    members of this union who were not authorized to engage in a

25    picket.  His attorney also called an attorney for the victim

1   company the day that this happened in Milton or the day after

2   and said, "Well, the union had nothing to do with this.  We'll

3   make sure they don't come back tomorrow."

4          And there's additional evidence, your Honor, that this

5   was not an authorized picket.  And what I mean by that is, when

6   there's going to be a picket, first of all, there are rules and

7   regulations that you have to abide by when you go to picket.

8   You can't block sidewalks and various other things.  We have

9   instructions that the Teamsters issue, written instructions, on

10  how you have to conduct yourself.

11         In addition, there's a signup sheet, and that's at the

12  union Hall, and you sign up to go to the picket.

13         THE COURT:  Who gets to say in the union, as you

14  understand it, "We are going to picket?"  Is it Mr. O'Brien --

15         MS. KAPLAN:  Yes.

16         THE COURT:  -- under these circumstances?

17         MS. KAPLAN:  Yes, yes.

18         THE COURT:  All right.  I'm sorry I interrupted, but I

19  wanted to get a broader sense of this.

20         MS. KAPLAN:  That's okay.  So, with respect to the

21  departure from the guidelines here, there is no evidence that

22  this defendant, unlike his co-defendants, engaged in physical

23  violence or the threats of physical violence.  He was, however,

24  as your Honor pointed out, the only union official present in

25  Milton.  He did nothing to prevent threatening conduct.  As I

1    said, he was seen on the videotape circling with the crew, and

2    he set up the meeting and he had these phone calls.

3         We believe that the sentence, your Honor, will promote

4    respect for the law.  We believe that this prosecution has

5    already sent a message that this type of conduct will not be

6    tolerated.  We believe that in terms of specific deterrence for

7    this defendant he has lost his position with the union, and as

8    a result of this conviction he is going to receive a bar letter

9    from the Department of Labor, and what that will do is

10   essentially prohibit him from holding office with any union for

11   a certain period of time, but it's a fairly significant period

12   of time.  So, essentially this prosecution has taken away his

13   livelihood, and we took that into account when fashioning a

14   sentence for the defendant.  We believe that, as far as general

15   deterrence goes, the message has been sent that the Government

16   will not tolerate this type of behavior by Unions.

17        So, largely, your Honor, it is due to Mr. Harrington's

18   role in the offense, which we could clearly see was different

19   than the role of his co-defendants, which led us to believe

20   that a sentence of probation with 6 months of home arrest was

21   sufficient but not greater than necessary to comply with the

22   *Sentencing Guidelines*.

23        THE COURT:  Let me ask you a disparity question, I

24   suppose.  It arises out of Judge Casper's case, and I am trying

25   to remember the name of the defendant, but it was

1    a-year-and-a-day sentence.

2              MS. KAPLAN:  James Deamicis.

3              THE COURT:  Right.  How does this compare with that,

4    and why should I distinguish this from that case, if you think

5    I should?  You may say that you did not think that was the

6    right sentence either.

7              MS. KAPLAN:  I did not think that was the right

8    sentence either, however, I do think it's distinguishable.

9    James Deamicis was known as "Jimmy the Bull," and in that case

10   there was testimony by multiple victims that he had put them --

11   that they were fearful of him, and he had gone to these victim

12   companies and basically was demanding money for himself and his

13   family and his friends or threatening that he would shut the --

14             THE COURT:  But if I understand it correctly, the way

15   in which Judge Casper was characterizing it was threat of

16   economic harm, not physical threats.  Now, it may be that his

17   Homeric epithet, "The Bull," and his demeanor would be

18   off-putting to people, but that is not the way she was

19   characterizing it, as I understand it.  She was saying this is

20   a threat of economic harm.  He did not say he was going to

21   break somebody's pretty little face in or anything like that

22   and did not engage in belly-bumping or chest-bumping, I guess

23   it would be here.

24             MS. KAPLAN:  Well, she sat through six weeks of a

25   trial that involved -- two trials that involved an awful lot of

1    relevant conduct about threats of violence.  There was no

2    actual physical --

3            THE COURT:  But that was her characterization.

4            MS. KAPLAN:  Okay.

5            THE COURT:  What I am trying to tease out, I think, is

6    a view that might be that the Guideline 2B3.2 encompasses a lot

7    of stuff in which there may be violence in the air but the

8    individual defendant is not involved directly or appreciably

9    indirectly in it himself, and she did not find the guidelines

10   at either end to be meaningful, and so she moved it back down.

11           MS. KAPLAN:  Well, I think it was in comparison to the

12   other defendants as well.  But I think that part of the

13   difference was that there were multiple victim companies in

14   that case, and it was Mr. Deamicis alone on some occasions that

15   went and made these direct threats of economic harm.  So, in

16   this case we don't have the defendant making direct threats of

17   economic harm.  We only have one victim.  So, I think that

18   that's part of how it's distinguishable.

19           THE COURT:  All right.  Now let me express a

20   concern -- over the years it has proven to be well-founded in

21   some cases -- which is someone pleads to a (C) plea for modest

22   involvement before the trial and then appears at trial and

23   offers testimony that is inconsistent with that, and that goes

24   to the question of talking about Mr. Deamicis being -- Judge

25   Casper having the benefit of two trials and you say six weeks

1    of trial, a lengthy period of time.  I do not have that here,

2    and so what is the basis for my believing that I know enough,

3    would be the basis for me believing I know enough about

4    Mr. Harrington's involvement to foreclose a different set of

5    characterizations here?  I am putting to one side whether or

6    not he testifies or not testifies, but that this

7    characterization is not one that would be challenged, say, by

8    one of the co-defendants who says, "I am not responsible.

9    Those telephone conversations I had with Mr. Harrington, they

10   included instructions to me," or, "Here is how the union wants

11   you to handle it," or, "Here is how I want you to handle it"?

12            MS. KAPLAN:  I am fairly confident, your Honor, that

13   the investigation that was done in this case, we interviewed a

14   lot of witnesses, close to 100 witnesses, and I don't think we

15   are going to find anyone else, that there's going to be anyone

16   else.  There are no other facts, I don't believe, that are

17   going to come before you, your Honor.  I think that, as

18   Mr. Goldstein said, what we've said is what there is.  I am not

19   sure that holds true for the other defendants, but I am fairly

20   confident and feel like, if there was more, that we would not

21   be before you today recommending a sentence of probation.

22            THE COURT:  All right.  Anything further?

23            Mr. Goldstein?

24            MR. GOLDSTEIN:  Thank you, your Honor.  I don't think

25   it's necessary to get so granular about, unless the Court wants

me to, in terms of what the Collective Bargaining Agreement

permits, doesn't permit and what those facts were.  There is a

small discrepancy between the defense and the Government in

terms of the what the intentions were on the night before.  It

was Mr. O'Brien who emailed the Collective Bargaining Agreement

to the line producer, and according to the Government it was

Mr. O'Brien who the next morning left a voicemail message

saying, "We know you're at Steel & Rye and we're sending 50

guys there to picket," and it's also the defense's

understanding that Mr. Harrington could authorize a picket.

        But I don't think any of that really, in my

estimation, is why I am asking the Court to accept the proposed

recommendation of the parties.  I'm asking the Court to

consider that recommendation as a fair and just resolution of

this case, because I do think it meets the goals, the

sentencing goals that are set forth in the overriding or the

guiding statute, which, of course, is 3553(a).

        I do think it meets the goal of specific deterrence.

You heard Ms. Kaplan say that Mr. Harrington will be precluded

from any union officer position.  Mr. Harrington has already

voluntarily left the union.  He did so fairly shortly after he

was indicted in this case.  He has no prior convictions, your

Honor.  There are two entries on his record which are detailed

in the Presentence Report, both of which I understand to be

union-related disorderly conduct kind of cases.  Him now

1   removed from any union activities or employment I think

2   reduces, if not eliminates, any risk of recidivism here.

3          So, I think in terms of specific deterrence, I don't

4   think there's any real risk of, *real* risk of Mr. Harrington

5   appearing before the Court.

6          In terms of general deterrence, your Honor, this case

7   has received extensive coverage by the press.  Just in the last

8   week there have been, I think -- there have been two articles

9   in the *Boston Herald*, if not front-page articles, featuring

10  Mr. Harrington.  It was covered at length by the *Boston Globe*.

11  It was covered at length by the television press.  And so, the

12  message that the Government takes these cases very seriously

13  has been sent to the community at large.

14          THE COURT:  Well, the question for general deterrence,

15  which is the one that I think is most salient for me now, is

16  not merely has someone been held up to shame and ridicule, that

17  sort of thing.  That happens in every case.  The question is

18  whether or not some greater depravation of liberty than 2 years

19  of probation and 6 months of home confinement is a proper way

20  to calibrate that portion, that is, the incarcerative or

21  liberty-depravation portion, of the sentence.  Six months' home

22  confinement is relatively modest.  I am sure those who have not

23  experienced it would think it is meaningless, but it is not, it

24  is a serious depravation, and being supervised by probation is

25  an interference with someone's life under any circumstances.

1    But the question is, is that enough?  And that is addressed to

2    other persons similarly situated to Mr. Harrington who might be

3    encouraged to take more proactive approaches to union members

4    who are engaged in conduct around him that would cause people

5    to say, "It is not worth the benefit of participating in this

6    way, because the costs are too great."  That is what it is

7    about.  So, maybe you want to speak more specifically to that.

8             MR. GOLDSTEIN:  Sure.  Well, I do think that someone

9    paying attention to this case would already say that the costs

10   are too great, your Honor.  You've heard Ms. Kaplan say that

11   he's lost his lifetime employment with the union.  It was a

12   mission in his life, as you have seen in the letters that

13   accompanied the Sentencing Memorandum.  Of course,

14   incarceration is one element of punishment, but it's not the

15   only means to punish, and the Supreme Court has said that

16   probation itself is a significant form of punishment.

17             But I think that the sentence of 2 years' probation,

18   if you are looking at someone similarly situated to

19   Mr. Harrington in either the general community or the union

20   community, I think that the message does get through to them,

21   your Honor, that they need to act in a different way as a

22   result of all that's happened to Mr. Mr. Harrington, as a

23   result of this prosecution.

24             And I think 2 years' probation is not a light

25   sentence.  I know that perhaps people talk about probation as

1      being some lenient form of punishment.  It is not a lenient

2      form of punishment.  I mean, I have clients who have undergone

3      years of probation, and 6 months of home confinement is not a

4      necessarily light punishment, but there are other features of

5      this case that would deter someone in the general community and

6      the union community, in particular, part of which is, yes, your

7      Honor, present in a lot of the cases in terms of the shame and

8      the publicity, but there's also his excommunication from the

9      union, which I think is a significant component of the

10     punishment in this case, your Honor.

11            And so, in terms of general deterrence, I do think

12     that the sentence recommended by the parties does adequately

13     meet that particular goal of sentencing.

14            And that dovetails in terms of the punishment

15     argument.  I think that Mr. Harrington has been and will

16     continue to be significantly punished as a result of his role

17     in this case.

18            And it was a lesser role, your Honor.  I think

19     Ms. Kaplan has articulated the reasons why Mr. Harrington is

20     different from the other defendants, and I think that also

21     goes, going back to general deterrence, the Court -- if there

22     are other convictions in this case there will be other

23     sentences in this case, and the Court's sentence has to or

24     should, I think, reflect individual roles and the role that

25     they played in the particular criminal event.

1            And the sentence that is advocated by the parties in

2    this case, your Honor, I think fairly reflects Mr. Harrington's

3    role in this case as well as his life arc, you know, something

4    that we set out in our papers to the Court.  Mr. Harrington is

5    an entirely self-made individual.  He overcame -- the Court

6    sees a lot of challenging backgrounds of people.  He did face

7    some adversity in terms of his childhood and overcame them, put

8    himself through college, became gainfully employed, became part

9    of the Teamsters, became part of the union, and rose to a

10   level, fairly significant level, within the Teamsters, the

11   union, and I think all of that speaks to who Mr. Harrington

12   really is, your Honor.  And he said in his letter to the Court

13   that his involvement in this case he doesn't think is

14   reflective of his true character.  And I would simply ask the

15   Court to consider that a lifetime, 62 years, of really making

16   all of the right decisions I think count for something at this

17   defining moment in his life, and I think it can be a basis for

18   this Court to exercise some level of compassion and discretion

19   and accept the proposed recommendation of the parties.

20           And so, unless the Court has particular questions in

21   terms of the sentencing presentation --

22           THE COURT:  No.  The only other one that, obviously, I

23   have to touch on is disparity with other sentences, and they

24   seem to be fairly fact-bound, enough so that I would feel a

25   little uncomfortable saying, "This one equates to that one,"

1    unless you have ones that you want to press on me.

2         MR. GOLDSTEIN:  No, your Honor.  I brought the

3    Deamicis case to the Court's attention because I knew it was

4    out there, and I defer to Ms. Kaplan, because it was her case.

5    I don't know very much about the facts of that particular case,

6    although I did know that that particular defendant, I witnessed

7    some testimony in that case where there was testimony regarding

8    him demanding personal payoffs in exchange for him kind of

9    going away and stopping his approaches to that particular

10   victim.  But Ms. Kaplan is in a far better position than I am

11   in terms of opining about similarities or distinctions between

12   this case and that case.

13        THE COURT:  All right.  Thank you.  I have the letter

14   from Mr. Harrington.

15        But if there is something further that you want to

16   say, Mr. Harrington, I will hear you now.

17        THE DEFENDANT:  Thank you, your Honor.  I just want to

18   say that, you know, I'm sorry for my action on that day.  It's

19   really been a very difficult time for myself and my family.  I

20   have dedicated my whole life to the union and my family, as you

21   see, and I just would ask you for your consideration in this

22   matter.  As they say, as Ms. Kaplan has said and Mr. Goldstein

23   has said, it is what I love to do I can no longer do, and

24   that's a sentence I'm going to have to live with for the rest

25   of my life, because I loved working for the union.  I loved

1    helping people.  I mean, as you saw in my letters, I thrived on

2    raising money for people, putting people's kids through

3    college, something I did on my own.  I just worked my whole

4    life for people, trying to help people, and that's all I ever

5    wanted to do, and that sentence alone is a life sentence.

6             Thank you, your Honor.

7             THE COURT:  Thank you, Mr. Harrington.

8             Well, as I said at the outset, I wanted to set the

9    terms of engagement so that the parties knew what they needed

10   to do to persuade me here, and, having listened carefully, I am

11   persuaded that this is within the realm of reasonable sentences

12   that can be imposed and one in which I can, consistent with my

13   responsibilities, put my signature to the judgment, and so I

14   will.  It is important for me to explain in greater detail why

15   I do that, because it is a departure, one that is accepted by

16   both parties here, and it is a substantial departure.

17           I share the view that, it was expressed more

18   particularly in the Deamicis case by Judge Casper, the

19   guidelines here capture a range of activity that is broader

20   than the guideline itself.  I am still satisfied that the

21   guideline chosen by the Probation Office was the accurate one.

22   There was violence in the air, but it is sometimes the case

23   that that is true of virtually every picketing circumstance,

24   job-action circumstance.

25           There is an issue that is raised about the

1    responsibility of someone who is a union leader to lead and

2    take affirmative action when confronted with union members who

3    are engaged in misconduct.  But this is a fast-moving,

4    fast-developing set of circumstances, and my view, which is

5    informed by the greater familiarity on the part of the parties

6    with the evidence that led them to this agreement, is that

7    there was a substantially different role in the offense for

8    Mr. Harrington.

9           But going through the 3553 factors, I do think this is

10   a fundamentally serious matter, serious crime.  This is

11   concerted action.  My own view is that there would need to be a

12   bit more evidence of Mr. Harrington's affirmative acceptance of

13   what it was that the other individuals are alleged to have done

14   to make him fully culpable, but it is critical to effectively

15   implementing our National Labor Policy that we are able to draw

16   lines.  The lines are clearest with violence, less clear or

17   less defined with threat of economic harm, because what, of

18   course, is a job action but threat of economic harm.  But there

19   are rules, they ought to be complied with, and those rules are

20   defined in various ways by various agencies from the NLRB to

21   State Courts to Federal Courts in Hobbs Act matters, and the

22   short of it is this is a serious crime.  But it is a serious

23   crime that can be committed in a variety of different ways with

24   a variety of different forms of activity, and I am satisfied,

25   as I said, that here I am on firm ground in accepting the

1   parties' judgments that this is a case in which

2   Mr. Harrington's involvement may be characterized as less

3   significant than others.

4          I turn to the nature and circumstances of the

5   defendant's life, because those are things that have to be

6   taken into consideration under 3553.  My view is that

7   Mr. Goldstein and Mr. Harrington have accurately described it.

8   This is someone who spent his life in an area in which he

9   thought he was providing support to working people through the

10  union.  There is no prior activity that would justify saying

11  that he spent his life with chalk on his shoes from playing it

12  close to the line.  It appears that he attempted to conduct his

13  union life the way it should be conducted.

14         Now, frequently labor disputes are highly contested,

15  but that is only part of what someone does as a labor leader,

16  and Mr. Harrington, it is clear from the letters, was engaged

17  in the kind of productive stuff that unions are supposed to do

18  and union leaders are supposed to do.  Effective here was the

19  statement of one of the letters that he advised his people that

20  you do not have a union unless you have got a company, and you

21  have got a responsibility to make sure that the industry itself

22  can support good jobs for hardworking people, and that he found

23  ways and welcomed ways and independently chose ways to support

24  people.  That is to the good.  It is not why we are here, but

25  it is to the good, and it is something that I consider in this

1    connection in deciding that I will accept the parties'

2    agreement.

3           The question of specific deterrence, which is, will

4    Mr. Harrington ever do this again, well, in some ways the

5    answer is provided by the circumstances themselves.  No,

6    because of the bar and related kinds of problems.  If he were

7    to be active again in this area I suspect that he would be even

8    more careful and understand that there is some responsibility

9    affirmatively to interfere with misconduct, even the misconduct

10   taking place over a one-day period, effectively.

11          I said general deterrence was the hardest part, and it

12   is.  The reason that there is a bar in the statutes is that

13   Congress was not satisfied with the Hobbs Act; they wanted to

14   find other ways to keep union officials from engaging in

15   misconduct.  It is the reason that, whether it is a resignation

16   or a forced retirement, Mr. Harrington is no longer working for

17   the union, because union officials are supposed to conduct

18   themselves in a particular way, and there are consequences for

19   doing it, and the question is whether or not there should be

20   greater consequences through the criminal law in the form of

21   incarceration.

22          Given the particulars of this case involving

23   Mr. Harrington and the wide range of activities that are

24   involved in Mr. Harrington's lesser role at really the low end

25   of this, it seems to me that properly calibrating a sentence

1    does not require prison, it does not require community

2    confinement; that home confinement for a period of time,

3    coupled with probation under these circumstances, reaches the

4    goal that is necessary to provide specific deterrence in the

5    larger context.

6         Now, would sending someone away for a very long time

7    be greater general deterrence?  I suppose so, but that is not

8    what the *Sentencing Guidelines* provide.  That is not the role

9    of sentencing.  It is not supposed to over-deter.  It is

10   supposed to be sufficient but not more than necessary to serve

11   this purpose, and I am satisfied that home confinement in this

12   probation context in this case serves even general deterrence,

13   although that is the hardest one for me.

14        I look at the question of whether or not there is some

15   role for prison to provide.  The role for prison to provide

16   under these circumstances is to impose on the taxpayers of the

17   United States the costs of confining someone for whom

18   confinement seems to me to be inappropriate, so I rule that out

19   as a consideration.

20        I am concerned about disparity, unwarranted disparity,

21   but here there were different roles; and, in fact, looking at

22   all of the cases there are different roles, and trying to apply

23   an understanding of the nature of employment disputes

24   recognizes a variety of different roles.  I do not think this

25   is a disparity that could be called unwarranted.  It, I think,

1    is a fair resolution, accommodation of the disparate interests

2    of the Government and the defendant, and, as I said at the

3    outset, I have an independent responsibility.  I have listened

4    as carefully as I can to this, and I have been persuaded that

5    the parties have reached an accommodation that I can reasonably

6    endorse by entering judgment on the lines that have been

7    provided by the parties.

8            So, let me turn, then, to the sentence specifically,

9    having set forth the reasons why I am prepared to accept the

10   (C) plea.

11           First, as I have said, the defendant is sentenced to a

12   period of probation for 2 years, that is to include a 6-month

13   period of home confinement at the outset, a fine of $10,000.

14   There is a mandatory Special Assessment of $100, and the

15   restitution is in the amount that is identified here by

16   Probation.

17           I understand there is some dispute about that

18   restitutionary amount here.  I am satisfied that it fairly

19   captures the kind of loss that is subject to restitution.  That

20   is $24,023.95 directed, as the Presentence Report indicates, to

21   the victims of the crime here.  I have to say that I will make

22   that joint and several here, because there are other persons

23   who may be responsible for it.  Right now the only person who

24   is responsible is Mr. Harrington.  It may be that at the

25   conclusion of the trial there will be other persons who are

1    responsible, but he is not the only person responsible,

2    according to the Government's theory of the case.

3          What that means is this:  that Mr. Harrington is

4    responsible to make payments immediately, that if he does not,

5    that there will be a payment plan that will be established for

6    him; that so long as payment is not fully paid he will be

7    subject to supervision that requires him to provide the

8    Probation Office with access to any requested financial

9    information, and that can be shared with the Financial

10   Litigation Unit of the United States Attorney's Office.  He is

11   prohibited from incurring any new credit charges or opening

12   additional lines of credit without the approval of the

13   Probation Office while any of the financial obligations are

14   outstanding.

15         The defendant has as a special condition one that I

16   always impose, the prohibition from possessing a firearm or

17   other dangerous weapon.

18         While he is serving the 6 months of home detention he

19   must provide for and pay for himself the location-monitoring

20   equipment as determined under the national contract that

21   Probation has, and he is responsible for returning that

22   monitoring equipment in good condition and may be charged for

23   replacement or repair of the equipment.

24         There are mandatory conditions as well:  The defendant

25   is obligated not to commit another federal, state or local

1    crime.  He may not possess illegally a controlled substance.

2    This is not a case in which drugs seem to me to be involved

3    and, as a consequence, I am going to suspend the drug-testing

4    requirements because, from all that appears, the defendant

5    poses a low risk of future substance abuse.  He is, however,

6    obligated to provide a DNA sample, as directed by the Probation

7    Office, and he is obligated to comply with the standard

8    conditions of supervision that are described in the *Sentencing*

9    *Guidelines* at Section 5D1.3C.

10          Now, are there any other conditions that the parties

11   would ask me to consider?

12          MR. GOLDSTEIN:  In terms of the home confinement, your

13   Honor, I have spoken to Probation about permitting

14   Mr. Harrington to leave the residence for limited reasons,

15   medical appointments, to attend church service, to work to the

16   extent that he can gain some kind of employment, and then also

17   four times a week for 1 1/2 hours a day to go to the gym.  I

18   think the Court has seen the medical history.  It's important

19   to Mr. Harrington that he actually continue with his exercise

20   regimen.

21          THE COURT:  Any objections from the Government?

22          MS. KAPLAN:  No, your Honor.

23          THE COURT:  And, Probation, any objections?

24          THE PROBATION OFFICER:  No, your Honor.  Thank you.

25          THE COURT:  So, I will incorporate those conditions.

1    But the one that gives me the most pause is work.  That is not

2    open-textured.  It is something that Probation is going to have

3    to approve, and it is not just a get-out-the-door opportunity.

4    My expectation is that "home confinement" means being confined

5    at home, not confined from religious services, not confined

6    from medical services, not confined from the opportunity to

7    engage in exercise that is necessary for his particular

8    condition, but it is confinement, and it will be supervised

9    effectively by Probation, and to the degree there are disputes

10   they will be brought to me to be resolved.

11          Now, are there any other matters that we need to take

12   up?

13          MS. KAPLAN:  The Government would move, your Honor, to

14   dismiss Count One of the Superseding Indictment.

15          THE COURT:  Right.  And you will submit a --

16          MS. KAPLAN:  We will submit a motion.

17          THE COURT:  -- in that regard.

18          One further point, Mr. Harrington.  In this session,

19   anyway, you have a right of appeal.  You will want to discuss

20   with Mr. Goldstein whether that makes any sense under these

21   circumstances.

22          I think I have tried to outline what the concerns are

23   here, and I do not mean to go on much further.  You recognize

24   that this was not something that you want to hold out as an

25   example of your life here in so many ways, but you have to pay

1    a price for having been involved in that.  This seems to me to

2    be a fair price for that and a reflection of all the other

3    things that you have done as a union leader that have mitigated

4    what otherwise would have been a rather severe price for this

5    activity.

6              If there is nothing further, then we will be in

7    recess.

8              MR. GOLDSTEIN:  Thank you, your Honor.

9              THE CLERK:  All rise.

10         (The Honorable Court exited the courtroom at 3:25 p.m.)

11          (WHEREUPON, the proceedings adjourned at 3:25 p.m.)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                          C E R T I F I C A T E

2

3

4              I, Brenda K. Hancock, RMR, CRR and Official Court

5    Reporter of the United States District Court, do hereby certify

6    that the foregoing transcript constitutes, to the best of my

7    skill and ability, a true and accurate transcription of my

8    stenotype notes taken in the matter of *United States v. Mark*

9    *Harrington*, No. 1:15-cr-10300-5-DPW.

10

11

12

13

14   Date: ____3/23/17____              */s/ Brenda K. Hancock*
                                        Brenda K. Hancock, RMR, CRR
15                                      Official Court Reporter

16

17

18

19

20

21

22

23

24

25